# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 6, 2002

## STATE OF TENNESSEE v. VINCENT HOWARD

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 99-04351, -52      J. C. McLin, Judge**

---

### No. W2001-01904-CCA-R3-CD  - Filed April 11, 2003

---

The defendant appeals his convictions of first degree felony murder and especially aggravated robbery.  He received a life sentence for the first degree felony murder conviction and an additional twenty-one year sentence for his especially aggravated robbery conviction.  The defendant contends the evidence is insufficient to sustain his convictions.   The defendant also argues his twenty-one-year sentence for especially aggravated robbery is excessive.   The defendant alleges the trial court misapplied enhancement factors (1), (8), (13), and (16) and erred in finding him a dangerous offender to support its consecutive sentence determination.  We affirm the convictions, but remove the presumption of correctness due to the misapplication of four enhancement factors and remand for a new sentencing hearing on the especially aggravated robbery conviction only.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Resentencing**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, JJ., joined.

A C Wharton, Jr., District Public Defender; W. Mark Ward, Robert Felkner, and Garland Ergüden, Assistant Public Defenders, for the appellant, Vincent Howard.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience R. Branham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On April 22, 1999, a Shelby County Grand Jury returned a two-count indictment charging the defendant, Vincent Howard, with (1) first degree felony murder and (2) first degree premeditated murder.  In a related, but separate,  indictment, the Grand Jury charged the defendant with especially aggravated robbery. The defendant was tried and found guilty by a jury of first degree felony murder and the underlying felony of especially aggravated robbery.  The defendant was sentenced to life

imprisonment for his felony murder conviction and twenty-one years for his especially aggravated robbery conviction, to be served consecutive to his life sentence. In this appeal, the defendant contends the evidence is insufficient to sustain his convictions, his sentence is excessive, and he should not be deemed a dangerous offender.

**Facts**

Jaclyn Marie Dunlap, an employee of Zeke's Lounge, testified she was not working on January 13, 1999. She went to Zeke's Lounge to visit the victim, a fellow employee, to talk about an argument she and her husband were having that night. She stated she and the victim were the only people in the bar, and she swept the floors while the victim stocked a cooler. She said that sometime after midnight she heard a scream and saw men enter the lounge. She crouched behind the bar and could see that the taller perpetrator wore a ski mask and pointed a .22 rifle with a black barrel at the victim. She said the man shouted at the victim to turn over all the money. She said she heard a bell sound as the victim took money from the register and handed it to the man holding the rifle. She said she noticed the other perpetrator did not wear a ski mask, was shorter than his accomplice, and had a lighter complexion. She said the shorter man ran about screaming for the victim to give him all the money. She stated the men would not leave after the victim handed over the four hundred dollars ($400.00) contained in the lounge's register. She stated she began to scream at the men to leave since the victim gave them the money. She said the victim came toward her when she began to scream and moved the man's gun barrel with his arm. She said she then heard two shots, the victim fell, gasping for air. She said the men were knocking bar stools down and fired another shot. She said she did not hear the men leave, but she crawled to the phone to call 911. She stated the police arrived as she spoke with the 911 operator.

On cross-examination, Ms. Dunlap testified the men entered the front door of the lounge because the other doors to the lounge were locked. She said the men entered the lounge with their guns drawn. She stated she was crouched behind the bar, but she could see what was going on from behind a video machine on the bar counter. She said the shorter man had a small pistol that resembled a .38. She said she was not sure which man fired his gun and that she heard the shots as she and the victim fell to the floor. She said that because the barrel of the rifle stayed pointed toward him, the victim hit the barrel to move it out of his way. She said she was unable to identify the man wearing the ski mask.

Officer Edward Vidulich of the Memphis Police Department testified that on January 13, 1999, he was the first officer on the scene after receiving a call concerning a robbery and a shooting at Zeke's Lounge. He stated he walked through the door of the lounge and found Ms. Dunlap screaming that the victim had been shot. He said he walked to the side of the bar and found the victim, unresponsive, lying on the ground. He stated the victim did not have a weapon, although he had personal knowledge that the owner of the lounge kept a black Derringer gun by the cash drawer. Police found the derringer under a cigarette machine, adjacent to a beer cooler. On cross-examination, Officer Vidulich testified he was the officer who entered the lounge while Ms. Dunlap spoke with the 911 operator.

Officer Shan Allen Tracy of the Memphis Police Department testified he responded to a call at Zeke's Bar on January 13, 1999, as a member of the crime scene unit. He stated the crime scene was secure upon his arrival, and the victim had been transported. He said he created a crime scene diagram which reflected the measurements of the lounge and its backward L-shape. He stated his diagram reflected the overturned bar stools, the victim's blue shirt, a .22 caliber casing, a bullet hole in the cooler, a two-shot Derringer, and blood smears. He said a bullet fragment was recovered from the cooler, and a .22 caliber casing was found on the floor. He stated the Derringer found at the crime scene had not been fired. He said the Derringer's safety was still on, and it was loaded with two rounds. He stated he photographed the crime scene and secured all of the evidence. He said he recovered a ski mask and hooded shirt from a vacant wooded lot located less than a mile from Zeke's Lounge on the day following the crime. The prosecution asked Officer Tracy to identify the aforementioned evidence by showing him crime scene photos and entered the photos into evidence upon the completion of his testimony. The prosecution also asked Officer Tracy to identify a spent .22 bullet and clothing. Officer Tracy recognized the spent bullet as one collected from the crime scene and identified a ski mask and hooded shirt found in the wooded area outside of Zeke's Lounge. The prosecution entered the spent bullet and clothing into evidence. Officer Tracy testified to engaging in the collection of evidence from the crime scene. He stated he photographed, measured, and sealed the evidence. He stated that he placed the evidence into envelopes and tagged it before taking it to the police property room. On cross-examination, he testified he was not the first officer on the scene, and police were inside and outside the lounge on the night of the incident. He stated the crime scene was secure when he photographed and sketched the crime scene.

Dorothy Jean McRoberts, the victim's sister-in-law, testified she had known her husband's brother for twenty years. She testified that the victim, Richard McRoberts, was known as Ricky Mack. She stated she last saw the victim at his home a week before his death and received a call later that he had been shot.

Sergeant James Ryall of the Memphis Police Department testified that he assisted Sergeant Shemwell with his investigation of the January 13, 1999, shooting and robbery at Zeke's Lounge. He stated he interviewed the defendant with Sergeant Greg Quinn. He said the defendant was advised of his rights before questioning. He said the defendant, in his first interview, told the officers a story that did not match information they had been given, which placed the defendant at the crime scene. He said the first interview was not reduced to a formal statement because the defendant became agitated. On cross-examination, Sergeant Ryall reiterated his testimony that the defendant did not seem to have any problems reading or understanding his rights. He stated the defendant said he understood his rights and signed the rights form. He said the defendant's statement had been typed.

Sergeant Ryall testified that during two interviews with the defendant, the defendant read his rights and seemed to understand what was asked of him. Sergeant Ryall read the defendant's statement given on January 16, 1999, to the jury. The defendant's statement contained his own admissions regarding his involvement in the crime. The defendant stated he wore a ski mask and staked out Zeke's Lounge with his accomplice, Trell. He stated that Trell fired a .38 pistol, and he

fired a semiautomatic .22 rifle loaded with two bullets. The defendant also stated that he robbed Zeke's Lounge to help Trell's mother pay her bills and to have "a little pocket change."

Officer Alvin Peppers of the Memphis Police Department testified he received a call on January 13, 1999, to procure homicide evidence from the morgue. He stated he collected and secured a full set of prints and a bullet fragment from the victim. He said he collected the bullet fragment and took it to the property and evidence room where it was logged in and preserved.

Sergeant Robert Shemwell of the Memphis Police Department testified he was assigned as the lead investigator of the robbery and homicide occurring at Zeke's Lounge. He stated he received two Crime Stoppers tips and a call from a field lieutenant naming the two suspects as responsible. He said Coach Hopkins at Frayser High School gave him the name and address of the defendant and Tavarsity Childers, who was called Trell. Sergeant Shemwell stated Tavarsity Childers, who was taken into custody, named the defendant as his accomplice for the robbery of Zeke's Lounge on January 13, 1999. He said Childers told police the defendant used a rifle, and it could be found in a dumpster in the rear of an apartment complex. He said Childers admitted he got his weapon, a .38 caliber revolver, from a fellow gang member. On cross-examination, Sergeant Shemwell testified he was not in the room where the defendant made his statement to police, but was present at the interview and reviewed the defendant's statement.

Officer D. H. Rowe of the Memphis Police Department testified that on January 17, 1999, he was called to 2605 North Watkins to investigate the contents of a dumpster in connection with a homicide investigation. He stated he climbed inside the dumpster and found a rifle wrapped in an old rug. He said the rifle contained one live round. He said he photographed the rifle and tagged the weapon and the round into evidence. On cross-examination, Officer Rowe reiterated his testimony that he secured the round found in the rifle. He said he did not search the immediate area and did not secure anything else from inside the dumpster.

Special Agent Steve Scott of the Tennessee Bureau of Investigation (TBI) testified he was assigned to review evidence submitted to the TBI regarding the victim's homicide. He stated he examined a rifle, a .22 caliber bullet, a bullet fragment, and a shell casing. He stated the semiautomatic rifle was missing its magazine follower, in which .22 caliber ammunition is pushed to form the spring pressure, but was in working order as a single-shot .22 rifle. He stated the trigger must be pulled with approximately seven pounds of pressure in order for the gun to fire. He stated it was his opinion that the .22 caliber cartridge case, he examined, had been fired from the rifle and "no other gun in the world." He stated he knew the rifle fired the .22 case recovered from the scene, because the shell and rifle have the same "mechanical fingerprint." He said he examined a bullet fragment from the victim's body and was unable to conclusively match the fragment to the gun. Because the fragment was so small, he stated he could not say that the fragment was from a bullet fired from the rifle, despite it being of the same caliber as the bullet fired from the rifle. He stated he examined one unfired .22 caliber cartridge to determine whether the live cartridge was consistent with the fired ammunition. He said he determined the unfired cartridge and fired ammunition were similar in shape and design, were made by the same company, and were composed of the same

material. He also stated the live cartridge is consistent with the two fired ammunition components that he examined. He stated he concluded the live cartridge and the spent cartridge had been together inside the rifle at one time. He stated that he attempted to find any markings present on the unfired cartridge indicating it had been run through the action of the gun without having been fired, but he could not find any identifying marks.

On cross-examination, Agent Scott reiterated his previous testimony that he could not conclusively state that the rifle fired the tip of the .22 bullet he examined. He stated he could not match the unfired cartridge to the rifle. He stated the .22 cartridge case found at the crime scene was fired from the rifle he examined and from that gun only. He said he could not say the bullet came from the case, but he said the casing was from the same ammunition manufacturer. He said the rifle could be up to thirty-three years old, but was in working order. He stated that he did not perform any tests to examine the wear and tear on the trigger mechanism and did not know if the magazine follower was on the gun at the time of the crime. He said he did not know if the gun was in working order in semiautomatic mode at the time of the robbery.

Dr. O'Brien Cleary Smith, Shelby County Medical Examiner, testified he conducted an autopsy of the victim. He stated the victim died as a result of a gunshot wound to his chest. He said it was his opinion the victim died as a result of the passage of one bullet through the victim's body. He said the bullet would have entered the victim's body and fractured as it hit the rib bone. He said he photographed the victim's wounds to the chest and a grazing gunshot wound to the victim's arm. He said the bullet struck the right side of his chest at fifty-five inches above the heal and eight inches to the right of the midline. He said the bullet entered the victim's heart, struck and fractured the fifth rib on the victim's right side, and bruised his right lung. He said the bullet went through the victim's diaphragm and injured his liver. He said the victim sustained internal bleeding as a result of his wounds. He said the internal bleeding would have resulted in the victim's windpipe filling with blood and blocking his airways. He stated the victim sustained contusions to his knees as a result of falling to the ground.

The defense offered no proof after the State rested its case against the defendant. The jury returned and announced that they had reached a verdict as to first degree felony murder and especially aggravated robbery, but were unable to reach a verdict as to first degree premeditated murder. The trial court accepted the jury's verdict of guilty of first degree felony murder and guilty of especially aggravated robbery and dismissed the jury.

At the sentencing hearing, the trial court imposed a sentence of life for the first degree felony murder conviction, a life sentence being the only available sentence. The trial court applied enhancement factors (1), (8), (13), (16), and (20), and four mitigating factors in making its sentencing determination for the especially aggravated robbery conviction. The trial court imposed a twenty-one-year sentence on the especially aggravated robbery conviction, to be served consecutively with the defendant's life sentence.

**Analysis**

**I. Sufficiency of the Evidence**

The defendant asserts the evidence is insufficient to support his convictions, because the State failed to prove beyond a reasonable doubt his identity as the perpetrator of the crimes. The proper inquiry for this Court to review the defendant's challenge to the sufficiency of the evidence to support a conviction is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). A guilty verdict accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). This Court may not substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305 286 S.W.2d 856, 859 (1956). In fact, this Court is required to afford the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)). Questions regarding credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A verdict of guilt removes the presumption of innocence from the defendant and replaces it with a presumption of guilt and, on appeal, the defendant's burden is to demonstrate why the evidence is insufficient to support his guilty verdict. State v. Carruthers, 35 S.W.3d 516, 557-58; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of first degree felony murder, in violation of Tennessee Annotated Code section 39-13-202. Our statute defines first degree murder, in part, as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . ." Tenn. Code Ann. § 39-13-202(a)(2). The Code further states "no culpable mental state is required . . . except the intent to commit the enumerated offenses or acts . . . ." Id. at (b). The death occurring under these circumstances must occur "in the perpetration of" the enumerated felony. State v. Hinton, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999).

The defendant was convicted of the underlying felony of especially aggravated robbery, in violation of Tennessee Code Annotated section 39-13-402(a). Our Code defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Especially aggravated robbery is defined as robbery "(1)

[a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a).

Although the defendant argues the evidence presented is insufficient to justify a rational trier of fact in finding him guilty beyond a reasonable doubt, he fails to make specific arguments as to the insufficiency of the evidence as it relates to his identity. The record reflects several instances in which the testimony establishes the defendant as the perpetrator of the crimes.

## A. Eyewitness Testimony

Jaclyn Dunlap witnessed the robbery and testified to the identity of the perpetrators. Dunlap testified that she saw two men enter Zeke's Lounge. She stated one of the men wore a ski mask and pointed a .22 rifle at the victim. She stated the other perpetrator did not wear a ski mask and ran into the bar screaming at the victim to hand over all of the money. She stated that the perpetrators would not leave even after the victim gave them the money from the cash drawer. She said the perpetrator, wearing the ski mask, pointed his rifle at the victim even after the victim gave them money from the cash drawer. She stated she saw the victim knock the rifle with his arm and heard two gunshots. She stated the victim then fell on top of her, gasping for air.

## B. Physical Evidence

The victim died as a result of a gunshot wound from a .22 caliber weapon. In the defendant's statement to police, he confessed to shooting a .22 rifle during his robbery of Zeke's Lounge. Based upon information from the co-defendant, the police found a discarded .22 rifle in a dumpster. This rifle was directly connected to the robbery at Zeke's Lounge after TBI Agent Steve Scott conclusively matched a .22 cartridge case found at the crime scene with the discarded rifle found by police. Agent Scott stated the cartridge case could have only been fired by that rifle and no other gun in the world.

## C. Defendant's Statement

The defendant confessed to committing the robbery, but was unsure as to whether his bullet hit the victim. In his statement to police, the defendant stated that he and his accomplice staked out Zeke's Lounge with the intent to rob the victim. The defendant stated that he wore a ski mask as he entered Zeke's Lounge with his .22 rifle. In his statement, the defendant described how he shot at the victim and took the money as "pocket change."

After viewing the evidence in the light most favorable to the prosecution, we conclude the defendant has not met his burden of proving the evidence insufficient to sustain his convictions. The evidence is legally sufficient for a jury to have found the defendant guilty of murder in the first degree and the underlying felony of especially aggravated robbery.

## II. Sentencing

Next, the defendant contends his twenty-one-year sentence for his especially aggravated robbery conviction is excessive, due to the trial court's misapplication of enhancement factors (1), (8), (13), and (16). The defendant also challenges the trial court's decision to run his especially aggravated robbery sentence consecutive to his life sentence for his felony murder conviction.

This Court's review of the sentences imposed is de novo with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). A presumption in favor of the trial court is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with these principles, there is no presumption of correctness and our review is de novo. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997). It is this defendant's burden to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Comments.

If no enhancement or mitigating factors are to be considered for sentencing, the presumptive sentence for especially aggravated robbery, a Class A felony, shall be the midpoint within the applicable range. Tenn. Code Ann. § 40-35-210(c). The range of punishment for especially aggravated robbery is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). Therefore, the midpoint of the range for especially aggravated robbery sans enhancement or mitigating factors is twenty years. If enhancement or mitigating factors exist, a trial court should enhance the sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors. Tenn. Code Ann. § 40-35-210(e); State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The weight given to each factor is left to the discretion of the trial court, as long as the trial court complies with the purposes and principles set forth by the sentencing act and supported by the record. State v. Kelley, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000); see Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Comments. Based upon the foregoing discussion, we conclude the trial court erred in sentencing the defendant and is not entitled to a presumption of correctness.

## A. Misapplication of Enhancement Factor (1)

The trial court found that the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate sentencing range. See Tenn. Code Ann. § 40-35-114(1) (Supp. 2001) (Amended 2002). At the time of trial, the defendant was eighteen years old and had an extensive history of criminal behavior as a juvenile. The record reflects the trial court applied enhancement factor (1) based upon the defendant's juvenile court record which was included in the presentencing report.

The defendant correctly asserts the trial court should have not found enhancement factor (1) upon his juvenile record. In 1995, the legislature amended Tennessee Code Annotated section 40-35-114 by adding enhancement factor (20), which allows for enhancement of a sentence if "[t]he defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult." Tenn. Code Ann. § 40-35-40-35-114(20) (Supp. 2001)

(Amended 2002). Our supreme court has held factors (1) and (20) are mutually exclusive in that factor (1) applies only to adult criminal conduct, as opposed to factor (20), which applies exclusively to juvenile adjudications of delinquent acts. State v. Jackson, 60 S.W.3d 738, 742 (Tenn. 2001). The defendant's presentence report lists several delinquent acts committed by the defendant that would have constituted felonies if committed by an adult. While the defendant's record supports application of factor (20), his juvenile record should not have been used to apply enhancement (1). Therefore, the trial court correctly applied enhancement factor (20), but erred in its application of enhancement factor (1).

## B. Misapplication of Enhancement Factor (8)

The trial court applied enhancement factor (8), which involves a defendant's "previous history of unwillingness to comply with the conditions of a sentence involving release in the community." Tenn. Code Ann. § 40-35-114(8) (Supp. 2001) (Amended 2002). The record reflects the trial court based its determination to apply this factor on the fact the defendant was on supervised probation as a juvenile on two occasions, as noted in the presentence report. Our supreme court has held that juvenile probation violations may be properly considered to determine a history of unwillingness to comply with the conditions of release into the community. Jackson, 60 S.W.3d at 740. However, the presentence report does not demonstrate the defendant's failure to comply with the conditions of his probation. Moreover, the trial court did not base its decision to apply this factor on any evidence to the contrary. If a defendant had admitted using drugs during his probationary period, a trial court could support its application of enhancement factor (8). See State v. George Blake Kelly, 1998 Tenn. Crim. App. LEXIS 1085, *35, No. 01C01-9610-CC-00448 (Tenn. Crim. App., Oct. 13, 1998, at Nashville). The trial court did not base its application of factor (8) on anything other than the defendant's juvenile probation record. The defendant argues that merely being on probation does not warrant the application of enhancement factor (8). We agree with the defendant and conclude the trial court erred in its application of factor (8) in determining the defendant's sentence.

## C. Misapplication of Enhancement Factor (13)

The defendant argues the trial court misapplied factor (13) in its determination of his sentence. According to Tennessee Code Annotated section 40-35-114(13), a sentence may be enhanced if "[t]he felony was committed while on any of the following forms of release status if such release is from a prior felony conviction:"
    (A)    Bail, if the defendant is ultimately convicted of such prior felony;
    (B)    Parole;
    (C)    Probation;
    (D)    Work release; or
    (E)    Any other type of release into the community under the direct or indirect supervision of the department of correction or local governmental authority.

The record reflects the State did not know if factor (13) should have applied to the defendant, and the trial court ultimately based its application of factor (13)(E) on the basis that the defendant was on "escape status." The presentence report indicates the defendant committed the crimes at issue while on pre-trial release for offenses of which he had not yet been convicted. The record is void of any evidence the defendant violated any terms of his pre-trial release. Although the defendant had pending felony charges against him, there was no proof of a conviction on any of the charges. Therefore, we find enhancement factor (13) was inapplicable to the defendant in this case. See State v. Watson, 1999 Tenn. Crim. App. LEXIS 659, *12, No. 03C01-9809-CR-00325 (Tenn. Crim. App., July 9, 1999, at Knoxville).

**D. Misapplication of Enhancement Factor (16)**

The trial court applied factor (16) in that "[t]he crime was committed under circumstances under which the potential for bodily injury to a victim was great," Tenn. Code Ann. § 40-35-114(16) (Supp. 2001) (Amended 2002). The defendant correctly asserts the trial court misapplied this factor because the potential is inherent in the crime of especially aggravated robbery. The record indicates that defense counsel objected to the trial court's application of factor (16), and the trial court responded to counsel's objections by stating "okay." The record also reflects the trial court eventually applied factor (16), absent any reasons for its finding.

Factor (16) specifically requires the risk or potential injury be to a *victim*. Tenn. Code Ann. § 40-35-114(16) (Supp. 2001) (Amended 2002) (emphasis added). This Court has held serious bodily injury is an essential element of especially aggravated robbery, therefore, factor (16) may not be applied on the basis of great potential for bodily injury to the victim of the offense. See State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). Our supreme court has held that factor (16) may not be based on the risk of injury to individuals other than the victim of the crime. State v. Imfeld, 70 S.W.3d 698, 706 (Tenn. 2002). Therefore, the trial court erred by applying this enhancement factor to the defendant's sentence for especially aggravated robbery.

**E. Consecutive Sentencing**

After applying the aforementioned factors and other uncontested enhancement factors, the trial court applied several mitigating factors before its final determination to sentence the defendant to a twenty-one-year sentence, to run consecutively with his life sentence for his felony murder conviction. The defendant argues the trial court erred in ordering him to serve this sentence consecutively, in that he should not receive dangerous offender status. The trial court based its imposition of consecutive sentencing upon criterion set forth in Tennessee Code Annotated section 40-35-115(b). The trial court determined the defendant to be an offender with an extensive criminal record. See Tenn. Code Ann. § 40-35-115(b)(2). The trial court also determined the defendant to be a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(b)(4). Our supreme court has held a trial court must find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that consecutive sentences

-10-

reasonably relate to the severity of the offenses committed.  <u>State v. Wilkerson</u>, 905 S.W.2d 933, 939 (Tenn. 1995).  The trial court utilized this exact language in determining that a consecutive sentence was necessary to protect the public from future criminal conduct by the defendant.  We conclude the defendant has a lengthy criminal history for someone his age.  Finally, the defendant robbed and shot someone for no other reason than to have "pocket change."  These facts support the trial court's determination that the defendant is appropriately classified as a dangerous offender.

### **Conclusion**

For the aforementioned reasons, we affirm the convictions, but remove the presumption of correctness due to the misapplication of four enhancement factors and remand for a new sentencing hearing on the especially aggravated robbery conviction only.

_____
JOHN EVERETT WILLIAMS, JUDGE